Mark CUSTER, Respondent,

v.

HARTFORD INSURANCE COMPANY, Appellant.

No. WD 62874.

Missouri Court of Appeals, Western District, En Banc.

Aug. 23, 2005.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 4, 2005.

Application for Transfer Denied Nov. 22, 2005.

Michael P. Bandre, Overland Park, KS, for appellant.

Steven C. Alberg, Olathe, KS, for respondent.

Before EDWIN H. SMITH, Chief Judge, HAROLD H. LOWENSTEIN, ROBERT G. ULRICH, PATRICIA BRECKENRIDGE, PAUL M. SPINDEN, JAMES M. SMART, JR., JOSEPH M. ELLIS, VICTOR C. HOWARD, THOMAS H. NEWTON, RONALD R. HOLLIGER, and LISA WHITE HARDWICK, Judges.

JOSEPH M. ELLIS, Judge.

Hartford Insurance Company appeals from an award entered by the Labor and Industrial Relations Commission finding that Mark Custer was entitled to workers' compensation benefits for injuries he sustained in an automobile accident. Specifically, Hartford challenges the Commission's findings that Custer was acting in the course and scope of his employment when the accident occurred and that he was permanently and totally disabled as a result of the injuries he sustained. For the following reasons, we affirm the Commission's award.

In 1985, Hartford hired Custer as a claims adjuster in Springfield, Missouri. After about two and a half years, Custer was transferred to Hartford's office in Overland Park, Kansas. By September 22, 1997, Custer had worked his way up the corporate ladder and was working for Hartford as a claims coordinator. In that capacity, he was charged with working with the underwriting department to write new business with corporate clients and to retain current business. An important part of his job was entertaining clients and agents. He also served as a liaison between the underwriting and the claims departments in an effort to keep the bigger insureds and the agents happy. Custer's job involved extensive travel away from the office, and Hartford provided him with a company car for which Hartford paid all expenses. As part of his duties, Custer would go out and visit with an insured about once every two weeks and would go out and visit an outside agent once a week. In his job capacity, Custer also participated in golf games with insureds, agents and/or underwriters on at least a weekly basis. These activities were approved of and encouraged by Hartford and constituted an important part of Custer's job.

On September 22, 1997, Custer drove his company car 30–40 miles from his office to a golf tournament organized by Hartford at the Dubs Dred Golf Course in Wyandotte County, Kansas. The e-mail sent to Custer and two other individuals by the main underwriter at Hartford told Custer to arrive at noon for lunch and stated that the tournament was to start at 1 p.m. The e-mail provided instructions on how to get to the course. The e-mail further indicated that they would be having hors d'oeuvres and drinks after the round and "suggested" that he be available for dinner with agents after the event.

During the tournament, Hartford provided free beer to the participants, and Custer drank at least four beers on the course. Several rain delays occurred, and the participants consumed more alcohol in the clubhouse on these occasions.

When Custer left the golf club to head home at about 7:30 p.m., it was dark and foggy out. About one mile from the golf club, as he was attempting to cross U.S. 73 highway, Custer's company car was struck by a car traveling on the highway.

Custer was severely injured in the accident, sustaining a closed head injury, a lacerated spleen, left pneumothorax, a retroperitoneal hematoma, a nasal fracture, a fractured left clavicle, fractured ribs, a sciatic nerve injury, a pelvic fracture, and posterior urethral injuries. He was taken

by ambulance to KU Medical Center for treatment. Custer underwent several surgical procedures for his injuries. He was comatose and remained on a ventilator almost two months after the accident. During his stay in the hospital, Custer also experienced sepsis and contracted pneumonia several times. He was eventually discharged from the intensive care unit on December 16, 1997. On December 30, 1997, Custer was deemed medically stable and was transferred from KU Medical Center to the Rehabilitation Institute. He left the Rehabilitation Institute on May 8, 1998, and went to Duke University to have his urethra repaired and rerouted. Subsequently, Custer received further medical treatment and therapy.

On October 23, 2000, Hartford sent Custer a letter indicating that they could not identify a position for him and that they were, therefore, terminating his employment. On November 2, 2000, Custer filed a claim for compensation with the Division of Workers' Compensation. Custer filed an amended claim on December 26, 2000. Hartford timely filed answers to both pleadings.

An administrative law judge ("ALJ") heard the claim on March 25, March 26, and April 8, 2002. On June 25, 2002, the ALJ issued her opinion finding that Custer's accident had occurred in the scope and course of his employment and that he was permanently and totally disabled as a result of the injuries he sustained.[1]

On July 12, 2002, Hartford filed its application for review by the Commission. Subsequently, the Commission ruled that the ALJ's award was supported by competent and substantial evidence and adopted that award and decision as its own. Hartford brings two points on appeal.

▮▮▮▮ Our standard of review requires us to "affirm the Commission's final decision unless it acted without or beyond its power, the decision was procured by fraud, the facts found do not support the decision, or the decision is not supported by sufficient competent evidence in the record." *Higgins v. Treasurer of State of Missouri*, 140 S.W.3d 94, 96 (Mo.App. W.D.2004) (citing § 287.495.1 ). "When the Commission affirms or adopts the findings of an ALJ (as it has done here), we review the decision and finding of the ALJ as adopted by the Commission." *Gassen v. Lienbengood*, 134 S.W.3d 75, 79 (Mo.App. W.D.2004). "All doubts as to the right of an employee to compensation must be resolved in favor of the injured employee." *Hilton v. Pizza Hut*, 892 S.W.2d 625, 630 (Mo.App. W.D. 1994).[2]

In arguing for the reversal of the Commission's award, the Dissent deviates from the latter rule, which is firmly entrenched in our case law. While the Dissent offers a thoughtful analysis of the issues involved in the manner in which the provisions of the Workers' Compensation Act are interpreted, the approach suggested by the Dissent would require this court to overrule numerous prior decisions of our Supreme Court and Court of Appeals spanning sev-

1. The ALJ found that there was Missouri jurisdiction over Custer's injuries, despite the fact that his place of employment was in Kansas and the accident occurred in Kansas, because Custer had been hired in Missouri. The ALJ also found that Hartford's intoxication defense lacked merit because there was no evidence adduced that Custer's drinking had anything to do with the accident and because the evidence reflected that Hartford knew of the alcohol consumption by its employees at the tournament and tacitly approved of those actions. These findings are not challenged by Hartford on appeal.

2. Overruled on other grounds in *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220 (Mo. banc 2003).

eral decades. *See e.g. Morrow v. City of Kansas City,* 788 S.W.2d 278, 279 (Mo. banc 1990) ("[I]n a workers' compensation case all doubts are to be resolved in favor of the employee."); *Wolfgeher v. Wagner Cartage Service, Inc.,* 646 S.W.2d 781, 783 (Mo.1983) ("Any doubt as to the right of an employee to compensation should be resolved in favor of the injured employee."); *Kelley v. Sohio Chemical Co.,* 392 S.W.2d 255, 259 (Mo.1965) (noting that the provision of § 287.800 providing that the Workers' Compensation Act " 'shall be liberally construed with a view to the public welfare' … has been held to mean that a doubt as to the right of compensation should be resolved in favor of the employee"); *Orr v. City of Springfield,* 118 S.W.3d 215, 217 (Mo.App. S.D.2003); *Bunker v. Rural Elec. Co-op.,* 46 S.W.3d 641, 649 (Mo.App. W.D.2001) ("[T]he compensation law 'is to be broadly and liberally construed and interpreted to extend benefits to the largest possible class and any doubt as to the right of compensation is to be resolved in favor of the employee.' "); *Schuster v. State Div. of Employment Sec.,* 972 S.W.2d 377, 384 (Mo.App. E.D.1998).

▮ "This court is constitutionally bound to follow the most recent controlling decision of the Missouri Supreme Court." *Kinder v. Missouri Dep't of Corrections,* 43 S.W.3d 369, 374 (Mo.App. W.D.2001) (citing Mo. Const. art. V, § 2). As the approach suggested by the Dissent would deviate from and, in fact, would require the overruling of the most recent controlling decisions of the Missouri Supreme Court, this court cannot entertain the changes to the existing case law proposed by the Dissent.

Moreover, on appeal, Hartford makes no claim that the cases requiring that any doubts as to the right of an employee to compensation should be resolved in favor

of the injured employee should be overruled. Accordingly, any claim of error related to the Commission's application of that rule and its continued viability and application to this Court's review has not been raised by the appellant, is not preserved for appeal, and need not be addressed by this Court. *Eckhoff v. Eckhoff,* 71 S.W.3d 619, 624 n. 1 (Mo.App. W.D. 2002).

▮ In its first point on appeal, Hartford merely contends that the evidence does not support the Commission's finding that Custer sustained his injuries in the course and scope of his employment because the going to and coming from work rule applies to preclude an award of benefits, claiming that none of the exceptions to that rule are applicable. Hartford specifically contends that Custer was not on a special errand for the employer and that there was no mutual benefit to the employer in Custer's journey home.

▮ "We determine whether the award is supported by competent and substantial evidence 'by examining the evidence in the context of the whole record.' " *Moriarty v. Treasurer of State of Missouri,* 141 S.W.3d 69, 72 (Mo.App. E.D. 2004) (quoting *Hampton v. Big Boy Steel Erection,* 121 S.W.3d 220, 223 (Mo. banc 2003)). We must ascertain "whether the Commission could have reasonably made its findings and reached its result upon consideration of all of the evidence before it." *Henley v. Tan Co.,* 140 S.W.3d 195, 198 (Mo.App. S.D.2004). We " 'examine the whole record to determine if it contains sufficient competent and substantial evidence to support the award, i.e., whether the award is contrary to the overwhelming weight of the evidence.' " *Moriarty,* 141 S.W.3d at 72 (quoting *Hampton,* 121 S.W.3d at 222–23).

In making this determination, this Court does not reweigh the evidence. *Henley*, 140 S.W.3d at 198. Findings of fact made by the Commission within its powers are conclusive and binding. *Id.* (quoting § 287.495.1 ). Accordingly, "[o]n issues concerning credibility and the weight to be given conflicting evidence, we defer to the Commission's judgment." *Moriarty*, 141 S.W.3d at 72. "However, we independently review questions of law without deference to the Commission's findings." *Henley*, 140 S.W.3d at 198.

"The purpose of Workers' Compensation Law is to 'place upon industry the losses sustained by employees resulting from injuries arising out of and in the course of employment and, consequently, the law should be liberally construed so as to effectuate its purpose and humane design.' "[3] *Rogers v. Pacesetter Corp.*, 972 S.W.2d 540, 542–43 (Mo.App. E.D.1998) (quoting *James v. CPI Corp.*, 897 S.W.2d 92, 94 (Mo.App. E.D.1995)). "The law must be broadly and liberally interpreted and is intended to extend its benefits to the largest possible class." *Hilton*, 892 S.W.2d at 630. "Therefore, '[a]ny question as to the right of an employee to compensation must be resolved in favor of the injured employee.' " *Rogers*, 972 S.W.2d at 543 (quoting *Brenneisen v. Leach's Standard Service Station*, 806 S.W.2d 443, 445 (Mo.App. E.D.1991)).

Hartford challenges the sufficiency of the evidence to support a determination that Custer's injuries arose out of and in the course of his employment with Hartford. "To be compensable under worker's compensation, an employee's injury must arise out of and in the course of his [or her] employment." *Roberts v. Parker–Banks Chevrolet*, 58 S.W.3d 66, 69 (Mo.App. E.D.2001).[4] " 'The general rule is that an injury is one that "arises out of" the employment if it is a natural and reasonable incident thereof and it is "in the course of employment" if the action occurs within a period of employment at a place where the employee may reasonably be fulfilling the duties of employment.' " *Clancy v. Armor Elevator Co.*, 899 S.W.2d 123, 125 (Mo.App. E.D.1995) (quoting *Ford v. Bi–State Development Agency*, 677 S.W.2d 899, 901 (Mo.App. E.D.1984)[5] (emphasis omitted)). " 'These are two separate tests both of which must be met before an employee is entitled to compensation.' " *Rogers*, 972 S.W.2d at 543 (quoting *Mann v. City of Pacific*, 860 S.W.2d 12, 15 (Mo.App. E.D.1993)[6]). "In our determination of whether an injury arises out of and in the course of employment, we must consider the particular facts and circumstances of each case." *Id.*

"In general, 'an employee does not suffer injury arising out of and in the course of employment if the employee is injured while going or journeying to or returning from the place of employment.' " *Id.* (quoting *McClain v. Welsh Co.*, 748 S.W.2d 720, 724 (Mo.App. E.D.1988)).

---

3. We note that the legislature has enacted significant changes to the Workers' Compensation Act in Senate Bill 1, which become effective August 28, 2005. Relevant to the way the provisions of the Workers' Compensation Act are construed, the new § 287.800 provides that the provisions of the Workers' Compensation Act are to be "construed strictly" by the ALJ, the commission, and "any reviewing" court.

4. Overruled on other grounds in *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220 (Mo. banc 2003).

5. Overruled on other grounds in *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220 (Mo. banc 2003).

6. Overruled on other grounds in *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220 (Mo. banc 2003).

"This is true because in most circumstances, 'a trip to or from one's place of work is merely an inevitable circumstance with which every employee is confronted and which ordinarily bears no immediate relation to the actual services to be performed.'" *Id.* (quoting *McClain*, 748 S.W.2d at 724.).

 "While this is the general rule, the principle may be modified by the particular facts, circumstances and situations re-. sulting in various and varied exceptions in order to accommodate both the employer and the employee." *McClain*, 748 S.W.2d at 725. "Certain exceptions to the general rule have been clearly delineated by the courts which permit a worker to be entitled to compensation." *Id.* "[T]he following exceptions have been recognized by our courts: (1) the 'journey' exception authorizes compensation when an injury suffered by the employee occurs while the employee is traveling for the employer[;] (2) the 'conveyance exception' where the employer furnishes the employee with a vehicle or the employee uses his own vehicle and the employer pays expenses on it when used for business purposes[;] . . . (3) the 'special task' exception whereby the employee performs a special task, service or errand in connection with his employment[;] . . . [and] (4) the exception which authorizes compensation where the duties of the employee entail travel away from the employer's business to obtain parts or supplies for employer." *Id.* To this list must be added the exception that an injury sustained by an employee while attending or traveling to or from an employer-sponsored social or recreational activity arises out of the course and scope of the employment if the activity benefits the employer's business in some way. *Ludwinski v. National Courier*, 873 S.W.2d 890, 892–93 (Mo.App. E.D.1994); *Graham v. La–Z–Boy Chair Co.*, 117 S.W.3d 182, 184–85 (Mo.App. S.D.2003).

 We conclude that several of these exceptions are applicable to the facts of the instant appeal and, therefore, the Commission did not err in finding that Custer's injury occurred during the course and scope of his employment. One such exception to the general rule involves employees "whose work entails travel away from the employer's premises." *Smith v. District II A & B*, 59 S.W.3d 558, 565 (Mo.App. W.D.2001).[7] "Employees whose work entails travel away from the employer's premises are held in the majority of jurisdiction[s] to be within the course of their employment continuously during the trip, except when a distinct [departure] on a personal errand is shown." *Blatter v. Missouri Dep't of Soc. Servs. Div. of Aging*, 655 S.W.2d 819, 825 (Mo.App. S.D. 1983)[8] (quoting *Larson, Workmen's Compensation Law, Vol. 1A, § 25.00*); *See also Smith*, 59 S.W.3d at 565. The employee is not required to have traveled a great distance or to have stayed overnight in order to fall within this exception and the trip may be local in nature. *See Brown v. Mid–Central Fish Co.*, 641 S.W.2d 785, 786 (Mo.App. W.D.1982); *Baldridge v. Inter–River Drainage Dist. of Mo.*, 645 S.W.2d 139, 140 (Mo.App. S.D. 1982); *Brown v. Weber Implement & Auto Co.*, 357 Mo. 1, 206 S.W.2d 350, 351 (1947).[9]

---

7. Overruled on other grounds in *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220 (Mo. banc 2003).

8. Overruled on other grounds in *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220 (Mo. banc 2003).

9. During oral argument, Hartford conceded that there is no difference, for the purposes of applying the traveling employee exception to the coming and going rule, with regard to whether the travel involves long distances or is confined to the local area.

The record in the case at bar reflects that Custer's job involved extensive travel away from the office [10] and that he was provided with a company car, the expenses for which were paid by Hartford, in which to perform duties away from the office. As part of his job duties, Custer regularly would go out of the office to visit insureds and outside agents. He also participated in golf games with insureds, agents and/or underwriters on at least a weekly basis. These activities were all approved of and encouraged by Hartford and constituted an important part of Custer's job. Viewed as a whole, the record supports a finding that Custer was an employee whose work entailed travel away from his employer's premises.

As noted *supra,* such employees are considered to be in the course and scope of their employment throughout any work-related journey, absent a distinct departure on a personal errand. On the date of the accident, Custer traveled, at the direction of his employer, to the golf course to participate in a golf tournament sponsored by his employer. His participation in the tournament was clearly work-related and for the benefit of his employer. As found by the Commission, Custer's actions in having dinner with agents after playing golf was likewise a requirement of his job, work-related, and of benefit to Hartford. Thus, the record does not reflect that Custer ever deviated from his work-related duties. In any event, at the time of the accident, Custer was traveling back home in his company car along the route set out for him by his employer. Such a journey home is considered to be in the course and scope of employment of an employee whose work entails travel away from the

employer's premises. *See Brown,* 641 S.W.2d at 786; *Baldridge,* 645 S.W.2d at 140; *Brown,* 206 S.W.2d at 351.

This conclusion is consistent with the case law. In *Brown v. Mid–Central Fish Company,* 641 S.W.2d 785, 786 (Mo.App. W.D.1982), an employee was injured in a one-car accident at 11:50 p.m. while returning to his home in Stilwell, Kansas, driving down Highway 69 in Johnson County, Kansas. The employee was a salesman for Mid–Central Fish Company, located at 1656 Washington Street in Kansas City, Missouri. *Id.* In that capacity, he serviced large restaurant accounts, working on his own schedule, calling on customers early in the morning and sometimes late at night. *Id.* His customers were located on the Plaza in Kansas City, Missouri, and in the south part of Johnson County, Kansas. *Id.*

On the day of the accident, the employee left home for work at 5:00 a.m. and worked until 3:00 p.m. when he made a delivery to Harry Starker's on the Plaza. *Id.* Later in the afternoon, he went to a co-worker's apartment in Merriam, Kansas, where he prepared dinner for two co-workers. *Id.* At 8:00 p.m., the employee went to a friend's home and then returned with the friend to his co-worker's apartment at 8:30 p.m. *Id.* The four individuals then watched Monday Night Football until 11:20 p.m. *Id.* The employee dropped his friend back off at his friend's house and then proceeded toward home. *Id.* The accident occurred at about 11:50 p.m. on Highway 69 near the junction of Highway 50 on the employee's normal route home from Kansas City. *Id.* The Commission found that, while the employee had temporarily deviated from his employment, he was acting in the

---

**10.** The vocational assessment from the Rehabilitation Institute, where the employer sent Custer to rehabilitate his injuries, states that Custer's job as a claim service coordinator

*"demanded extensive travel,* marketing, sales, and conducting presentations/educating new customers." (emphasis added).

course and scope of his employment when he commenced to drive his company car home over his regular route home. *Id.* This Court found that the record supported the Commission's award. *Id.*

In *Baldridge v. Inter–River Drainage District of Missouri,* 645 S.W.2d 139, 140 (Mo.App. S.D.1982), the injured employee was a dragline and bulldozer operator, who lived in Broseley, Missouri. On the date of the accident, he was working northwest of Broseley. *Id.* Sometime that day, the employee went to Sikeston and then to Qulin, Missouri, to look for parts for the dragline and purchased some parts at one of those locations. *Id.* Getting parts for the dragline was part of his job. *Id.* The employee ate at a café in Qulin and then headed for home. *Id.* Qulin was approximately six miles south of Broseley. *Id.* About 5:25 p.m., the employee was killed when his truck left the highway and overturned. *Id.* The *Baldridge* court held that "there was evidence from which the Commission could have found that [the employee] was going home and was in Broseley nearing the end of a trip created by the duties of his employment" and that he therefore fell within the exception to the going and coming rule "for employees whose work entails travel away from the employer's premises." *Id.* The *Baldridge* court stated:

> When he was searching for parts or buying other items for use by his employer, [the employee] was operating the same as any traveling employee, and would be in the course and scope of his employment until the trip ended. Here it would not end until he reached home. Even if [the employee]'s eating at the café was a deviation from his employment, ... at the time of the accident [the employee] was following a direct route home and thus would have again been in the course of his employment. *Id.* at 140–41.

In *Brown v. Weber Implement & Auto Company,* 357 Mo. 1, 206 S.W.2d 350, 351 (1947), the injured employee was a salesman employed by Weber killed in an automobile accident in his company car while heading home at 1:30 a.m. On the night of the accident, the employee, his wife, and another couple went to the Chain Yacht Club, where the employee was a member and frequently socialized, after the employee received a call from a representative of the yacht club who was interested in buying some spark plugs and oil for the club and who requested that the employee come to the club. *Id.* at 353. After taking an order for spark plugs and oil, the employee, his wife, and the other couple remained at the yacht club drinking and dancing until 1:30 a.m. *Id.* The *Brown* court held that the Commission could reasonably have concluded from the evidence that "the work of the employee created the necessity for the travel and that the trip would have been made though the private errand had been cancelled." *Id.* at 354 (internal quotation omitted). The court stated that, while the evidence could also have supported an award for the employer, the award issued by the Commission was supported by competent and substantial evidence. *Id.* at 355.

There is no discernible reason to differentiate the case at bar from the three aforementioned cases. Custer was an employee who regularly traveled away from his employer's premises to perform various job duties and who was provided with a company car for such travel. Hartford paid all expenses on the vehicle. On the date of his injury, he traveled to a golf course in another city in another county in order to take part in a golf tournament at the direction of his employer. He was

clearly along the route home, following the directions provided by his employer, when his injury occurred. Accordingly, the "journey" exception is applicable, and the Commission did not err in finding that Custer's injury occurred in the course and scope of his employment with Hartford.

Even if we were to assume, however, that Custer was not an employee whose work entailed travel away from his employer's premises, his travel to and from the golf tournament sponsored by his employer would be deemed to be part of the course and scope of his employment because he was on a "special errand" for his employer. "The 'special errand' rule states that when an employee, having identifiable time and space limits on his employment, makes an off-premises journey which would normally not be covered under the usual going and coming rule, the journey may be brought within the course of employment by the fact that the trouble and time of making the journey, or the special inconvenience, hazard, or urgency of making it in the particular circumstances, is itself sufficiently substantial to be viewed as an integral part of the service itself." *Hilton*, 892 S.W.2d at 634; *See also Larson's Workers Compensation Law, § 14.05* (2004). "Thus, while the general rule is that accidents incurred while an employee is going to or coming from work are not compensable because they do not arise out of and in the course of employment, that rule is not applicable where the employee during that period performs a special task, service or errand in connection with [his or] her employment." *Hilton*, 892 S.W.2d at 630. " 'Such circumstance might be better characterized as causing a trip made in performing such a special task to be a part of the employment.' " *Id.* (quoting *Delozier v. Munlake Constr. Co.*, 657 S.W.2d 53, 55–56 (Mo.App. S.D.1983)).

In the case at bar, Hartford ordered Custer to participate in a golf tournament that it was sponsoring 30 to 40 miles away from his office and from his home. The record reflects that this course was quite a bit further away from the office than the golf course he usually played on for business purposes and that the he had never been to this particular course before. Returning from the course, Custer would have driven past the Hartford offices on his way home, which was approximately twelve minutes further from the golf course than his office. He participated in the tournament and the subsequent dinner for the purposes of his employer and at the direction of his employer. Thus, Custer was exposed to the special inconvenience of driving 30 to 40 miles to the golf course, where he worked into the evening for his employer, and was then exposed to another 30 to 40 mile drive on a dark, rainy night to get back home. Viewed as a whole, the additional trouble, time, inconvenience, and hazard involved in making this trip for Hartford was sufficient for this to constitute a "special errand" for his employer and the coming and going rule was not applicable.

The Commission's award is also sustainable under the "dual-purpose doctrine". "Under the dual-purpose doctrine, which is normally applied only to a situation involving travel, if the work of the employee creates the necessity for travel, he is in the course of his employment, though he is serving at the same time some purpose of his own." *Id.* at 631. "[I]f the trip as a whole was sufficiently motivated by the employment to be compensable on the way out, the same should be true of the journey back.... The correct rule in these cases is that the return trip from a dual-purpose journey, at any point where it constitutes a return from places that had to be reached for business

reasons, is within the course of employment." *Larson's Workers Compensation Law, § 17.02(9)(a)* (2004). Accordingly, even if Custer is viewed as having personal reasons for participating in the tournament and even if his trip home was motivated by his personal desire to get home and relax, the fact that his trip to the golf course was clearly necessitated by his employment and served to benefit his employer brings his travel within the dual-purpose doctrine.

■ Finally, the case law related to injuries sustained while attending or traveling to or from an employer-sponsored social or recreational function is worthy of note.

[A]ll the cases discussed appear to recognize that under appropriate circumstances an injury sustained by an employee while attending *or traveling to or from* an employer-sponsored social affair may arise out of the course and scope of employment so as to be compensable under workmen's compensation.

The cases reveal that no general rule has been developed which can be applied to all situations for the determination of the circumstances under which the injury may be considered to have arisen out of and in the course of employment, with the result that the determination is made by the consideration of various relevant factors, accorded varying degrees of weight, applied to the particular facts and circumstances of each case. In as much as injuries sustained by an employee in connection with an employer-sponsored event usually occur while the employee is not performing the duties for which he was employed, the inquiry is whether the social affair is sufficiently related to the employment to justify the conclusion that the injury arose out of and in the course of employ-ment. Whether an employee injured while attending *or traveling to or from* an employer-sponsored social affair was compelled, directly or indirectly to attend, whether the employer derived some benefit from his sponsorship of the function, the extent to which the employer sponsored, controlled, or participated in the activity, and whether the social affair was a benefit or consideration of employment to which the employee was entitled, have been recognized as the primary elements to be considered in determining the compensability of the injury.

*Ludwinski,* 873 S.W.2d at 892 (quoting *Riggen v. Paris Printing Co.,* 559 S.W.2d 625, 629 (Mo.App. W.D.1977)) (emphasis added). In the case at bar, the record supports the Commission's finding that Custer was directed by his employer to attend the golf tournament and that he was required by his job to have dinner with agents after the tournament. Hartford sponsored and exerted significant control over the function and did so to further its own business interests. Taken together, these factors weigh in favor of a finding that participation in and travel to and from this employer-sponsored event is compensable.

■ While § 287.120.7 was amended subsequent to the preceding cases to preclude coverage for voluntary recreational activities sponsored by the employer, the statute provides an express exception to that provision where the employee is ordered to participate in the activity or program or where the employee was paid wages or travel expenses while participating in the recreational activity or program. Furthermore, the voluntary recreational activity exception does not apply where the employee is conducting business for the employer. *Rogers,* 972 S.W.2d at 545. More specifically, where an employee's

participation in golf tournament benefits his employer's business in some way, the golf tournament cannot be considered to be purely recreational so as to trigger the provisions of § 287.120.7. *Graham,* 117 S.W.3d at 186. Thus, Custer's injuries would be deemed to have arisen out of and in the course of his employment under this rationale as well.

All of the foregoing "exceptions" to the coming and going rule are simply sets of circumstances under which the courts of this state have determined the journey to and/or from work is deemed to be within the course of employment. While the Dissent would apparently attempt to overrule all of the cases that have recognized such "exceptions" over the years, it offers no compelling arguments warranting such a drastic change to the case law, and as noted *supra,* we are precluded from doing so because we must follow the most recent controlling decisions of our Supreme Court. *Kinder,* 43 S.W.3d at 374.

For all of the foregoing reasons, the Commission did not err in finding that Custer's injury occurred during the course and scope of his employment and in awarding benefits to him. Point denied.

In its second point, Hartford claims that the Commission erred in determining that Custer was permanently and totally disabled as a result of the injuries sustained in the accident. Hartford contends that the Commission improperly discounted the opinions offered by Hartford's various experts asserting that Custer was employable in the open labor market. Hartford asserts that the Commission failed to objectively review and evaluate the medical evidence presented and placed too much weight on the fact that Hartford had not been willing to employ Custer in any capacity.

"A claimant is considered totally disabled, for purposes of the [Workers' Compensation Law], if he is unable to return to any employment, not merely the employment in which he was engaged at the time of the accident." *Kerns v. Midwest Conveyor,* 126 S.W.3d 445, 451 (Mo. App. W.D.2004) (citing § 287.020.7). " '[T]he test for permanent total disability is the worker's ability to compete in the open labor market in that it measures the worker's potential for returning to employment.' " *McCormack v. Carmen Schell Const. Co.,* 97 S.W.3d 497, 512 (Mo.App. W.D.2002)[11] (quoting *Karoutzos v. Treasurer of the State of Missouri,* 55 S.W.3d 493, 499 (Mo.App. W.D.2001)[12]). "The 'pivotal question' is whether an employer can reasonably be expected to hire this employee, given his or her present physical condition, and reasonably expect the employee to successfully perform the work." *Garrone v. Treasurer of State of Missouri,* 157 S.W.3d 237, 244 (Mo.App. E.D.2004).

The ALJ's award, which was adopted by the Commission, extensively addressed the nature and extent of Custer's disability. Indeed, the ALJ devoted more than two single spaced typewritten pages to discussion of the evidence regarding Custer's disability. Based upon this thorough review of the evidence, Custer was determined to be unable to compete in the open labor market due to the injuries he sustained in his work-related car accident and was, therefore, permanently and totally disabled.

---

**11.** Overruled on other grounds in *Hampton v. Big Boy Steel Erection,* 121 S.W.3d 220 (Mo. banc 2003).

**12.** Overruled on other grounds in *Hampton v. Big Boy Steel Erection,* 121 S.W.3d 220 (Mo. banc 2003).

 Hartford acknowledges that the Commission was entitled to make credibility determinations related to the expert testimony offered at the hearing. Indeed, this Court must " 'defer to the Commission on issues concerning credibility and weight to be given to conflicting evidence and testimony.' " *Birdsong v. Waste Management,* 147 S.W.3d 132, 139 (Mo.App. S.D. 2004) (quoting *Maas v. Treasurer of the State of Mo.,* 964 S.W.2d 541, 545 (Mo.App. E.D.1998)). " 'The Commission is free to disregard testimony of a witness even if no contradictory or impeaching evidence is introduced.' " *Id.* Furthermore, "[i]t is in the Commission's sole discretion to determine the weight to be given expert opinions." *Id.* "[O]ur courts have consistently held that the Commission, in cases of competing expert medical evidence, is free to pick and choose which expert to believe." *Kerns,* 126 S.W.3d at 452–53.

 This case clearly involved testimony by multiple experts for both the employer and the employee that could have supported a decision either way. Hartford certainly presented sufficient evidence from which the Commission could have determined that Custer was not permanently and totally disabled had the Commission found that evidence credible. The evidence presented by the employee, however, was likewise more than sufficient, if deemed credible, to support a finding that he was permanently and totally disabled. Reconciliation of such conflicting evidence is a question of fact for the Commission. *Garrone,* 157 S.W.3d at 245. Despite differing medical opinions as to the extent of Custer's injuries and his employability, the Commission's award is clearly not contrary to the overwhelming weight of the evidence and, thus, is supported by competent and substantial evidence on the whole record.[13] *See Hampton,* 121 S.W.3d at 223–24; *Kerns,* 126 S.W.3d at 451.

Hartford does not, however, challenge the sufficiency of the evidence to support the award nor does it offer an argument attempting to establish that the overwhelming weight of the evidence established that Custer was not permanently and totally disabled. Instead, Hartford takes issue with the portion of the award referencing the fact that Dr. Childers, Dr. Zarr and the Rehabilitation Institute made their determinations as to Custer's employability prior to his interviewing for a claims adjuster position with Hartford and that the fact-finder was giving "little if no weight to the employer's defense, as well as the evidence presented on this issue since Hartford would not hire Claimant in any capacity despite their own experts' recommendations." Hartford contends that this statement establishes that the Commission improperly failed to even consider the testimony of its expert witnesses and based its finding entirely upon Hartford's failure to rehire Custer, which it contends could have occurred for any number of reasons, rather than upon a finding that its experts were not as credible as Custer's experts. Hartford asserts that "[t]he action of the Commission was in excess of its powers and is an abuse of discretion as it failed to weigh or consider credible and properly admitted evidence on its own merits and instead punish Hartford for failing to rehire Custer."

Hartford cites to no authority for its apparent contention that the Commission

---

13. "An award of workers' compensation benefits 'that is contrary to the overwhelming weight of the evidence is, in context, not supported by competent and substantial evidence.' " *Kerns v. Midwest Conveyor,* 126 S.W.3d 445, 452 (Mo.App. W.D.2004) (quoting *Hampton,* 121 S.W.3d at 223). "A decision is against the overwhelming weight of the evidence if we are left with a firm impression that it is wrong." *Id.*

cannot consider whether the employee had success in his or her attempts to obtain further employment in determining whether the employee is employable in the open labor market, and we have found no such authority. Regardless, the award reflects that the ALJ and the Commission considered all of the evidence offered by Hartford and Custer and simply found that the expert testimony offered by Custer was more credible.[14] That decision was well within the province of the Commission. The award certainly does not, as contended by Hartford, establish that the Commission did not even consider the testimony of its experts due to Hartford's failure to rehire Custer. Point denied.

For the foregoing reasons, the Commission's award is affirmed.

EDWIN H. SMITH, C.J., LOWENSTEIN, BRECKENRIDGE, HOWARD, NEWTON, HOLLIGER, and HARDWICK, JJ., concur.

SMART, J., dissents in separate opinion filed.

ULRICH and SPINDEN, JJ., concur in dissent.

JAMES M. SMART, JR., Judge, dissenting.

Mr. Custer, whose work was over for the day, was no longer "in the course of his employment" at the time of this injury.

I start with the observation that the claimant's injuries bore a circumstantial or positional relationship to his employment. The claimant, a few minutes before the accident, had been engaged in work for his employer; and, were it not for his work, he presumably would have been somewhere else at the time of the accident.

Because of the positional relationship of the injury to his employment, and because of natural sympathy as to his injuries, there is a huge temptation to construe the Workers' Compensation Act in such a way as to award compensation for these injuries. What is troubling, however, is the question of whether, as a matter of statutory interpretation, we can reasonably rule that this injury arose "in the course of" his employment, within the meaning of section 287.020.3.

Inherent in this inquiry is the question of how we are to approach this case. If we are, as section 287.800 says, to construe the terms of the statute liberally, "with a view to the public welfare," are we to apply the law with a built-in bias in favor of the claimant in our proceedings under the act? I pause to consider this question before proceeding further with the analysis.

The workers' compensation law is "entirely a creature of statute." *Greenlee v. Dukes Plastering Service*, 75 S.W.3d 273, 276 (Mo. banc 2002). Therefore, our judicial decisions must start and end with the statutory language. We must yield to legislative policy as expressed in the language employed by the General Assembly.

Sections 1.010 and 1.090 are provided by the General Assembly to guide us in the interpretation of its enactments.

> ... [N]o act of the general assembly or law of this state shall be held to be invalid, or limited in its scope or effect by the courts of this state, for the reason that it is in derogation of the common law, or with such statutes or acts of parliament [of England]; but all acts of the general assembly, or laws, shall be

---

**14.** Indeed, the award states, "[t]he opinions of Dr. Prostic, Dr. Logan and Mary Titterington, the vocational expert, leave no doubt that Claimant is unemployable on the open labor market as a result of the car accident in 1997."

liberally construed, so as to effectuate the true intent and meaning thereof. Section 1.010, RSMo 2000.

Words and phrases shall be taken in their plain or ordinary and usual sense, but technical words and phrases having a peculiar and appropriate meaning in law shall be understood according to their technical import. Section 1.090, RSMo 2000.

Also, as already mentioned, the Workers' Compensation Act itself includes a provision relating to judicial interpretation and application of the Act:

All of the provisions of this chapter shall be liberally construed with a view to the public welfare and a substantial compliance therewith shall be sufficient to give effect to rules, regulations, requirements, awards, orders or decisions of the division and the commission, and they shall not be declared inoperative, illegal or void for any omission of a technical nature in respect thereto.

§ 287.800, RSMo 2000.[1]

In 1925, after two prior workers' compensation enactments had been defeated by public referendum, a compensation law that was supported by both labor and business groups was enacted with broad public approval. R. Robert Cohn, History of Workmen's Compensation Law, *reprinted in* 15 V.A.M.S. 17–52 (1965), at 22–24. The act codified the common law principle that the employer had a responsibility to provide a reasonably safe place to work and a reasonably safe method of work. *See Kelso v. W.A. Ross Const. Co.*, 337 Mo. 202, 85 S.W.2d 527, 534 (1935); *See also* COHN at 24–25. It replaced that part of the common law that required that the employee prove the employer's negligence, and it abrogated the traditional common law defenses, such as contributory negligence. *Id.* at 22–24. The act thus eliminated courtroom contentions about fault between employer and employee while providing a modest but relatively definite remedy for workers injured on the job.

It hardly needs to be said that under the common law no employer had a duty to ensure that employees arrived home safely after work, regardless of the location of the work site. The statute similarly limited compensation to injuries arising "out of" and "in the course of" employment. § 287.020.3. The act provides compensation only for injuries occurring during the employee's work at a place where the work required the worker to be. *See* § 287.020.5. Thus neither the common law, the history of the act, nor the language of the act suggests that any portion of the act was aimed at adding a requirement that employers take responsibility for getting their employees safely home after the employees had finished work and had left the work premises.

Section 1.010 rebuts the notion that an act in derogation of the common law must be construed strictly. It cautions against the strict application of legal technicalities in a way that would undermine the purposes of the act. The Workers' Compensation Act, like all other statutes, is thus to be construed liberally to effectuate its true purposes. This would obviously mean construing the statute in a way that is not narrow and not begrudging and not with undue emphasis on technicalities, so that the purposes of the statute are not undermined.

In section 287.800, the legislature said the workers' compensation statute is to be

---

1. An original part of the 1925 statute. See Section 13672a75 of Chapter 128A, 1927

Supp. to Missouri Revised Statutes.

construed liberally with a "view to the public welfare," choosing to use the exact phrase that had been used earlier with regard to interpretation of the terms of the Public Service Commission Act.[2] The legislature did *not* say to construe the statute with a view to "claimant welfare." It is not clear that the phrase "public welfare" is always equivalent to "claimant welfare," though in any given case there may be practical overlap of these concepts.[3]

Section 1.090 exhorts the courts to take the words and phrases of the statutes in their "plain or ordinary and usual sense." That principle can be applied harmoniously with the principle of liberal construction with a view to the public welfare.

> Section 76 of the act provides that "all of the provisions of this act shall be liberally construed with a view to the public welfare," etc, evidently intending that the act shall be so construed as not to be unnecessarily restricted by a technical construction of the words used therein, but rather that such words be construed in the broader, popular sense.

*Drecksmith v. Universal Carloading & Distrib. Co.*, 18 S.W.2d 86, 87 (Mo.App. 1929). As the Missouri Supreme Court stated in 1933, liberal construction of the Workers' Compensation Act "does not authorize extending the terms of the act beyond what they plainly say." *State ex rel. Sei v. Haid*, 332 Mo. 1061, 61 S.W.2d 950, 954 (1933). Thus, there can be a type of liberal construction that is faithful to both the plain text and the purposes of the act. A few courts have suggested that a liberal construction "with a view to the public welfare" does not necessarily mean that the compensation proceedings must be biased in favor of the claimant. See, e.g. *Reed v. Kansas City Wholesale Grocery Co.*, 236 Mo.App. 402, 156 S.W.2d 747 (1941):

> The liberal construction that is required [of the Workmen's Compensation law] is "with a view to the public welfare." This does not mean that any strained construction of the law should be made or allowed for the purpose of permitting an exorbitant award solely for private gain. This would clearly be opposed to the public welfare and the public policy of the state as exemplified in the Compensation Law. The liberal construction that is meant here is that the law shall be applied so that a claimant will be considered within its scope if reasonably possible, and, that while the law should be liberally construed to that end, it should also be justly administered with equal equity to both the employer and the employee.

*Id.* at 753.

We have used some phrases that can hinder our efforts to understand and properly harmonize these principles. For instance, the majority opinion states that the law "is intended to extend its benefits to

---

**2.** "A substantial compliance with the requirements of this act shall be sufficient to give effect to all the rules, orders, acts and regulations of the commission, and they shall not be declared inoperative, illegal or void for any omission of a technical nature in respect thereto. The provisions of this act shall *be liberally construed with a view to the public welfare*, efficient facilities and substantial justice between patrons and public utilities."

Section 127 of the Public Service Commission Act, Laws 1913, p. 648. (Emphasis added.)

**3.** As the majority mentions, while this case was pending, the General Assembly enacted changes to section 287.800 as well as other portion of the Worker's Compensation Act. Senate Bill 1, effective August 28, 2005. The change to 287.800 provides that the provisions of the Worker's Compensation Act are to be "construed strictly."

the largest possible class." [4] Although the Missouri Supreme Court has seldom chosen to use this phrase,[5] our intermediate appellate courts have used it with increasing frequency, with two-thirds of the seventy-five reported cases in Missouri using this phrase having been issued since 1989. The phrase could be thought of as supporting the notion that every injury that could "possibly" be considered to be compensable should be held to be compensable.

Such notion, however, does not square with either the Workers' Compensation Act itself or with the Supreme Court's pronouncement as to the standard of review. *See Hampton v. Big Boy Steel Erection,* 121 S.W.3d 220, 223 (Mo. banc 2003):

> There is nothing in the constitution or section 287.495.1 that requires a reviewing court to view the evidence and all

favorable inferences drawn therefrom in the light most favorable to the award. *Id.*

The notion that "any question" or "any doubt" as to compensability is to be resolved in favor of the employee originated, at least in part, I believe, from cases commenting on the liberal construction to be applied to the *terms of the act.* In *Dauster v. Star Manufacturing Co.,* 145 S.W.2d 499, 503 (Mo.App.1940), for instance, the court expressed the view that, in accordance with the broad construction enjoined by section 287.800, any question as to the meaning of a *term of the act* should be resolved in favor of the claimant. The phraseology was modified in subsequent cases (citing *Dauster*) so that now it is not uncommon for the Commission or a court to say that "all doubts [implying 'all doubts of *any* kind,' not merely doubts about the meaning of a word or a phrase in the

---

**4.** Originally, the phrase was used in a particular context. Borrowing the language of a Vermont case, the Missouri Supreme Court employed the phrase in the context of determining the scope of one of the exceptions from coverage. *Klasing v. Fred Schmitt Contracting Co.,* 335 Mo. 721, 73 S.W.2d 1011, 1014 (1934). In *Klasing,* the employee recovered a personal injury damage award against his employer after pleading exemption from the act because his "average annual earnings" exceeded $3,600 per year. *Id.* at 1012. During the year of the accident, the employee earned more than $3,600 per year. *Id.* The court construed the statutory phrase "average annual earnings" to include consideration of two prior work years under the same employer (so there were some other years to "average" beside the year in which the accident occurred). Because the employee made less in the two prior years than in the year of the injury, the "average" did not exceed $3.600 per year. Thus, the court vacated the employee's $15,000 personal injury award on the ground that the exception did not apply; the compensation act was the exclusive remedy. *Id.* at 1015. The court did not construe the statutory phrase in question in a way that was favorable to the injured employee. Rather, it

avoided a strained construction that would have allowed the employee to keep his personal injury award but would have narrowed the scope of the act by narrowing the class of workers governed by the act. The only other early cases reciting the same rule about the "largest possible class" were also concerned with the scope of the application of the entire statutory scheme in the public interest. *See, e.g., Sayles v. Kansas City Structural Steel Co.,* 344 Mo. 756, 128 S.W.2d 1046 (banc 1939), *overruled by Snowbarger v. M.F.A. Cent. Co-op.,* 317 S.W.2d 390, 395 (Mo. banc 1958); *State ex rel. Mills v. Allen,* 344 Mo. 743, 128 S.W.2d 1040 (banc 1939); *Metzinger v. H.A. Dailey, Inc.,* 358 Mo. 689, 216 S.W.2d 480 (1948); *Dost v. Pevely Dairy Company,* 273 S.W.2d 242 (1954).

**5.** The first and only Supreme Court case to use this phrase in a context other than the construction of a statutory exclusion to coverage was *Wolfgeher v. Wagner Cartage Service, Inc.,* 646 S.W.2d 781 (Mo.1983), in which the court broadly construed the term "accident." The Missouri Supreme Court has never quoted this phrase to justify construing all factual possibilities in favor of the claimant.

statute] should be resolved in favor of the employee." *See, e.g., Baer v. City of Brookfield,* 366 S.W.2d 469, 471 (Mo.App. 1963); *Rogers v. Pacesetter Corp.,* 972 S.W.2d 540, 542 (Mo.App.1998); *Brenneisen v. Leach's Standard Serv. Station,* 806 S.W.2d 443, 445 (Mo.App.1991).

While the Missouri Supreme Court has occasionally used this terminology, it has used it only in connection with actually construing a term of the act, *see, e.g., Wolfgeher v. Wagner Cartage Service, Inc.,* 646 S.W.2d 781, 783 (Mo.1983) (construing the term "accident" broadly), or in *obiter dictum,* where the terminology did not govern the result, *see Kelley v. Sohio Chemical Co.,* 392 S.W.2d 255, 259 (Mo. 1965) (upholding a denial of compensation).

Although in actual practice the courts do not always resolve "all doubts" in favor of the claimant, we sometimes give the impression that the rule we are following is that compensation must be allowed whenever it is possible to conceive of any kind of basis for compensability. This impression stands in contrast to the earlier suggestion that while the act is to be liberally construed with a view to the public welfare, the law should be "justly administered with equal equity to both employer and employee." *Reed v. Kansas City Wholesale Grocery Co.,* 236 Mo.App. 402, 156 S.W.2d 747, 753 (1941). Neither liberal construction of statutory terms with a view to the public welfare, as the statute calls for, nor liberal construction of statutory terms favoring the claimant (which may often as a practical matter be the same thing), "authorize extending the terms of the act beyond what they plainly say." *Haid,* 61 S.W.2d at 954. The act is to be construed so as to give effect to the "plain and ordinary meaning" of the words "if possible." *Greenlee v. Dukes Plastering Serv.,* 75 S.W.3d 273, 276 (Mo. banc 2002).

In light of the foregoing, one can see that we are to give a liberal construction to the scope *of the act,* with a view to the public welfare, so as not to exclude any class of workers that the legislature would not have intended to exclude. § 287.800. We are also to favor a broader rather than a narrower interpretation of the *terms* of the act. *Id.* This will result in injuries and occupational diseases being deemed compensable as they are reasonably determined to fit within the plain and ordinary meaning of the statutory terms, including definitions. We are to give effect to the *plain words* in their ordinary meaning as much as possible. *Greenlee,* 75 S.W.3d at 276; *Pierson v. Treasurer of Mo.,* 126 S.W.3d 386, 390 (Mo. banc 2004); section 1.090. In reviewing a record, we are to view the evidence and the factual findings objectively, determining whether the ruling of the Commission is supported by competent and substantial evidence in the context of the whole record. See *Hampton v. Big Boy Steel Erection,* 121 S.W.3d at 223.

Our task of analysis here is also affected by the 1993 amendments to the Workers' Compensation Act. In that year, the Missouri General Assembly, apparently not content with some existing approaches of the Commission and the courts, adopted statutory changes which seemed, on their face, designed to limit, rather than expand, compensability in certain cases. Prior to the 1993 amendments, section 287.020.2 only served to define the word "accident." The 1993 revision added the following sentences to that subsection:

An injury is compensable if it is clearly work related. An injury is clearly work related if work was a substantial factor in the cause of the resulting medical condition or disability. An injury is not compensable merely because work was a triggering or precipitating factor.

Section 287.020.2.[6] This language was not previously a part of the act.

With this amendment, the General Assembly indicated it wanted to exclude from compensation those injuries or conditions where the injury was not substantially related to the employment but was only "triggered" or "precipitated" by the employment. § 287.020.2. That amendment only serves, in my view, to make clearer in this case what would otherwise have been already clear about whether the claimant here was in the course of his employment.

When the only relationship between the work and the injury is that the injury occurred in a traffic accident while the employee was traveling home from a different worksite than usual, it would seem to be an instance of the work merely "precipitating," or merely "providing an occasion" for the injury. *See Bear v. Anson Implement, Inc.,* 976 S.W.2d 553, 556–57 (Mo.App.1998).

The majority in this case prefers to engage in discussion of the "coming and going rule" and its judicially crafted exceptions.[7] While this practice may often be useful, it can also, unfortunately, cause failure to consider whether the worker was "in the course of employment" as that phrase is ordinarily understood.[8] *See, e.g., Brown v. Mid–Central Fish Company,* 641 S.W.2d 785 (Mo.App.1982), which is discussed in the majority opinion.

Mr. Custer frequently traveled (or "extensively traveled," in the words of the majority opinion) to other portions of the metropolitan area to call on customers and agents. There is no dispute that Mr. Custer had an office at his employer's local headquarters and that he regularly spent a substantial amount of his work time, if not the majority of his work time, at that office. There is also no dispute that he was *not* in the process of returning to the office for some employment purpose at the time of the accident. There is also no dispute that this event was in the metropolitan area, not in another community.

Once the golf event was over, Mr. Custer was on his own time. He could go

---

**6.** Also, the General Assembly in 1993 decided in the revisions to provide more specific guidelines for determining when an injury has arisen "out of and in the course of employment." § 287.020.3(2). The parties here do not discuss these guidelines. Nor does the majority opinion discuss these amendments at all. Because I believe this case is resolved simply on the basis of the plain language of the phrase "in the course of employment," it is unnecessary to address these guidelines in this opinion.

**7.** This "rule" originally arose in personal injury cases in the context of respondeat superior liability of employers. *See, e.g., Sharp v. W. & W. Trucking Co.,* 421 S.W.2d 213, 219 (Mo. banc 1967). Under the "rule" in that context, *i.e.,* if this were a personal injury suit by another driver against the Hartford for Custer's negligence, Custer probably would not be considered in the course of his employment. *Id.* Thus, the workers' compensation cases borrowed the concept from agency law, but we have applied it in compensation cases

in a way that is asymmetrical to agency law, because of the broad exceptions in the compensation context.

**8.** In this case, the ALJ and the Commission extensively discussed the "coming and going rule" and its exceptions before deciding that none of the exceptions were specifically applicable here. The ALJ and the Commission then decided that, in any event, consideration of the "totality of the circumstances" suggested that this injury was compensable. The Commission, in other words, set up the going and coming rule as the basis of analysis, considered the exceptions, then essentially dismissed the whole analysis, thereby in effect attempting to create another exception, the "totality of the circumstances" exception— which, unfortunately, provides no guidance at all. The majority opinion wisely avoids following the Commission's analysis. The majority, however, errs by sticking with a discussion of the rule and its exceptions rather than applying the plain language of the statute.

home or wherever he wished to go. He was in the metropolitan area. His employer had no say over where he resided, where he would go following the golf event, or what route he would take to get wherever he was going. He was no longer, under any normal or ordinary understanding of the phrase, "in the course of his employment" at the time of his injury. Nor, in the words of section 287.020.5, RSMo 2000, was he "engaged in or about the premises where [his] duties [were] being performed, or where [his] services require[d][his] presence as a part of such service."

In this case, there is no doubt about the plain and ordinary meaning of the phrase "course of employment." There is also no doubt about the material facts, which the parties agree upon. While some cases are extremely difficult to resolve, this one is not, once one gets past the erroneous notion that the case must be governed by decisions discussing the "coming and going rule" and its exceptions.

Contrary to what the majority implies, the Missouri Supreme Court has never suggested that we should routinely jettison analysis based on the plain meaning of the statutory terms and base our analysis on the going and coming rule and its exceptions. Moreover, although the ruling that I suggest in this case may seem contrary to a few intermediate appellate decisions,[9] it is not precluded by any decision of the Missouri Supreme Court.

One decision of the Missouri Supreme Court relied upon significantly by the majority is *Brown v. Weber Implement & Auto Company*, 357 Mo. 1, 206 S.W.2d 350, 351 (1947). That case involved a salesman who had made a sales call at a yacht club, then stayed at the yacht club with his wife and some friends for several hours, then was injured on the way home. The Court's affirmance in that case noted that the evidence was such that it also could have supported an award for the employer. That decision, which was based in part on the conflict in the testimony, was prior to the Supreme Court's decision in *Hampton v. Big Boy Steel Erection, supra*, which specified a different standard of reviewing the facts. It was also prior to the 1993 amendments. Finally, it involved an employee involved in outside sales rather than an employee who spends part of his time in social contacts with customers and agents. An outside sales person is ordinarily in the course of his or her employment whenever driving during the work day. Thus, in my view, it is distinguishable and does not dictate an award for the claimant in this case.

The fact that the claimant drove a company car, like the fact that golf ordinarily is recreational, is immaterial in this case. The car was freely available to the claimant for personal as well as business purposes. The employer did not restrict the use of the vehicle in any way. The record does not show that when the claimant drove the vehicle for personal use, there

9. *Brown v. Mid–Central Fish Co.*, 641 S.W.2d 785 (Mo.App.1982); *Baldridge v. Inter–River Drainage Dist. Of Mo.*, 645 S.W.2d 139, 140 (Mo.App.1982). I say they *seem* contrary because I do not agree with the majority that these decisions are sufficiently similar to govern this case. Brown involved a salesman who called on restaurants. He worked entirely on his own schedule, including sometimes late at night. *Id.* at 786. *Baldridge* is also different in that there the parties disput-

ed whether the employee was still engaged in his work at the time. Part of his work, which was "more or less" on his own schedule, involved searching for parts and buying items for the dragline and bulldozer operation. At the time of the accident, he had tools, parts and oil in his truck belonging to the employer. *Id.* at 140–41. While I am not sure either of these decisions are particularly well-reasoned, they do not preclude a ruling for the employer in this case.

was any benefit to the employer such as would be provided from advertising written on the side of the car. *See Otte v. Langley's Lawn Care, Inc.,* 66 S.W.3d 64, 67 (Mo.App.2001). Also, this is not like the case of a car salesman driving a demonstrator under the strict rules of the employer, as in *Hill v. Royal Gate Dodge,* 887 S.W.2d 640, 641 (Mo.App.1994). Nor does it involve a demonstrator car used "strictly for business purposes," as in *Reece v. Neal Chevrolet & Universal Underwriters Insurance Co.,* 912 S.W.2d 599, 601 (Mo.App. 1995).

There was no evidence presented at the hearing as to the employer's purpose in providing the car. Perhaps, for all we know, the provision of the vehicle in this case was simply a form of additional compensation to a valuable employee. We have no information from which the Commission could have concluded in these circumstances that the use of the company car placed the claimant in the course of his employment. Whether the employee was driving home from work, going to work, or was engaged in a shopping errand to the store, the use of the company car does not place him in the course of his employment. On the other hand, when the claimant was driving to a customer relations event for his employer during the work day, he was "in the course of his employment" regardless of who owned the car he was driving. The ownership of the car is a classic "red herring."

*Bear v. Anson Implement, Inc.,* 976 S.W.2d 553 (Mo.App.1998), relied upon by the employer in this case, was resolved in accordance with the plain language of the statute although the court also discussed the "going and coming rule." In *Bear,* the employee was released from his regular work early to go to a medical appointment for a work-related injury. He attended his 5:00 PM employer-authorized medical ap-

pointment, which extended past the regular work hours. On his way home from the medical center (which was not his normal worksite), his vehicle was struck by another vehicle that crossed the highway center line. *Id.* at 555. Thus, the injury had a "positional risk" relationship to the work. That is, if it had not been for the original work-related injury, he would not have been going home at the later hour on the route in question. It was because of the work that he was driving on the highway at that precise time in the evening traffic.

This court in *Bear,* however, found that the claimant was not engaged in the course of his employment at the time. The court said that it was *not* sufficient that the work "simply furnished an occasion for an injury," or that the work "caused him to be at the place where it happened." *Id.* at 556–57. The employee was finished with his work-related activities for the day. He was not going back to work. He was free to go home or wherever he wished for his own purposes. *Id.* at 558. He was not where his employment required him to be to perform his employment. *Bear* accords with a normal, everyday understanding of the phrase "in the course of employment." *See also Snowbarger v. M.F.A. Cent. Co-op.,* 349 S.W.2d 224, 226 (Mo. banc 1961) (auto accident while en route to see his family doctor for work-related medical treatment; held not in the course of employment). Had the claimant spoken to a family member or friend on the phone just after leaving the golf course, and had he been asked, "are you still at work," he would not have answered in the affirmative.

Just as this court did in *Bear,* we should apply the plain and ordinary meaning of the phrase in question. Our attempt to liberally construe the phrase with a view to the public welfare does not require or jus-

tify going beyond the plain and ordinary meaning. It does not permit us to say that the act of driving home from a golf course some 30 or 40 miles from the claimant's home in his own metropolitan area—not an extraordinary distance within the area—is "in the course of" his employment. To reach that conclusion would expand the terms of the statute. Moreover, it would raise many unanswered and perplexing questions, such as whether the result would be different if he had played at that golf course regularly, or if the golf course had been only 2 miles from his home, and so on.

Mr. Custer, like the claimant in *Bear*, was finished with his work-related activities for the day and was free to go home or wherever he wished for his own purposes. His employer was not responsible to get him home safely. There is no ordinary construction of the phrase "course of employment" that would include the activities of Mr. Custer at the time of the accident, though the evidence showed that the employment was positionally related to his injury.

It is not without significance that neither Mr. Custer nor the Commission had a clear theory as to the basis of Mr. Custer's claim. The Commission looked to the "totality of the circumstances," which is arguably a feeling-based test. Mr. Custer's attorney similarly argued that the "bottom line" was the attorney's "strong feeling" that Mr. Custer "was at work." These are not statutory concepts; nor do they give adequate guidance.

### Conclusion

The 1925 General Assembly, in my view, intended to avoid a narrow construction of the scope of the act and of words like "accident," "injury," and "course of employment." But I do not believe the drafters intended to expand the employer's responsibility beyond the workplace to include making sure that employees arrive home safely after work. The broad application of words and phrases can go no broader than the boundaries of the plain and ordinary meaning of the terms in question.

The Commission's decision goes beyond the plain and ordinary meaning of the words "in the course of employment." The conclusion reached is not supported by substantial and competent evidence on the whole record. Therefore, I submit that we have no choice but to reverse the award of the Commission.

ULRICH and SPINDEN, JJ., concur in the dissent.